**STATE of Missouri, Plaintiff–Respondent,**

v.

**Clarence FRIEND, Defendant–Appellant.**

**Clarence FRIEND, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–Respondent.**

**Nos. 16258, 17529.**

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 31, 1991.

Rosalynn Koch, Columbia, for defendant-appellant, and movant-appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Presiding Judge.

The defendant Clarence Friend was convicted by a jury of first degree assault, § 565.050 [1], a class B felony, and sentenced by the court to 25 years imprisonment [2]. In case No. 16258, the defendant appeals his conviction. In case No. 17529, the defendant appeals the denial of his pro se Rule 29.15 motion. We consolidated the appeals pursuant to Rule 29.15(l).

## ISSUES ON APPEAL: NO. 16258

In his direct appeal, the defendant raises three issues, all related to the admissibility of certain evidence at trial. We must decide whether the trial court committed reversible error by:

1. Allowing a prior statement of a companion at the time of the assault, who at trial invoked his Fifth Amendment right to not testify, to be read to the jury;

2. Admitting a holster and firearm over the objection that there was a lack of connection of those items to the defendant and the crime; and

3. Allowing testimony about the defendant's escape from a halfway house and his commission of a burglary and theft.

We conclude the trial court did not err. We affirm the judgment.

## ISSUE ON APPEAL: NO. 17529

The defendant claims the trial court erred in denying his request for postconvic-

---

1. All statutory references are to RSMo 1986, unless otherwise indicated.

2. At the February 6–8, 1989, trial, outside the presence of the jury, the court heard evidence that the defendant had pleaded guilty on July 18, 1980, to a charge of second degree robbery. The court found the defendant to be a prior and dangerous offender. On March 10, 1989, following a hearing on the defendant's new trial motion and pre-sentence investigation report, the trial court sentenced him to 25 years imprisonment. In its written judgment, the court stated that the defendant was "a prior/persistent/class X offender." On April 17, 1989, the trial court issued an amended judgment in which it stated the defendant was a prior offender only; nevertheless, the court reiterated the sentence to be 25 years.

 The 25–year sentence appears to be correct. Under § 558.016, the trial court may sentence a dangerous offender to an extended term of imprisonment—in the case of one convicted of a class B felony, to a term not to exceed 30 years. The trial court did not find, and the record does not support a finding, that the defendant was a persistent offender as defined in § 558.016.3 or a class X offender, a category defined in § 558.019.4(3) and not directly applicable to sentence enhancement under § 558.016. Section 558.016 does not permit sentence enhancement for a prior offender. Thus, under § 558.011.1(2), the maximum term of imprisonment for a prior offender convicted of a class B felony would be 15 years. Despite the failure of the judgment or the amended judgment to describe the defendant as a dangerous offender, the trial court correctly found, on the record, that the defendant was a prior and dangerous offender because he previously had pleaded guilty to a charge of second degree robbery. See §§ 558.016.2; 558.016.4(2); 569.030.2; 556.061(8).

 Our conclusion about the correctness of the term of imprisonment is supported by the fact that in this appeal and in his pro se Rule 29.15 motion, the defendant does not challenge the length of his sentence. Should our reading of the record concerning the defendant's status as a dangerous offender differ from the trial court's understanding, the matter may be corrected following the remand we order in case No. 17529.

tion relief without determining why his postconviction counsel failed to amend his pro se Rule 29.15 motion. The trial court was in error. We reverse and remand No. 17529.

## CASE NO. 16258

### FACTS

Just after midnight on October 12, 1987, Springfield police officer Mark LaRose became involved in a high speed pursuit of a 1975 Chrysler Cordoba automobile. The chase commenced when the auto sped up after LaRose tried to stop it to investigate the driver for a possible DWI charge. Ultimately, the Cordoba went out of control and came to a stop. LaRose's patrol car slid into the driver's side front fender of the Cordoba. LaRose and the Cordoba driver got out of their respective cars at the same time. They were eight to ten feet apart, and the area was lighted by the patrol car's red lights and headlights and the Cordoba's headlights. LaRose could see the facial features of the Cordoba driver, whom he did not know.

As LaRose got out of his patrol car and stood up, he saw the defendant raise a small handgun and fire one shot. LaRose saw the muzzle flash and experienced a concussion sensation pass the right side of his face. LaRose immediately drew his service revolver and fired a single shot in the direction of the defendant, apparently missing. The defendant turned and ran away.

Bobby Joe Letterman was a passenger in the Cordoba. LaRose was acquainted with Letterman and had an opportunity during the chase to recognize him. When the Cordoba stopped, Letterman remained in the car. After the defendant fled, LaRose took Letterman into custody. At the scene of the shooting, Letterman told LaRose that the Cordoba driver who fired at the officer was a person named "Donny."

Among the items found in the Cordoba were one spent .22 caliber rim-fire casing, a type of shell used in semiautomatic weapons; a box of Federal .22 caliber long rifle rounds; and one unexpended .22 caliber magnum cartridge. No weapon was found. Other evidence in the Cordoba included bank deposit slips from the Shamrock Liquor Store in Conway, Missouri, a quantity of liquor, and the defendant's palm print on a window of the vehicle.

During the afternoon of October 12, Letterman gave a statement to officer Jerry Patton which Patton tape recorded. Contrary to what Letterman had told LaRose at the scene about "Donny" being the driver and assailant, Letterman told Patton the defendant was the driver and assailant. Letterman told Patton that, on October 11, he and the defendant went to a river where they took target practice with two .22 caliber handguns: one was "[b]lue steel with round plastic handles, long barrel .22 automatic" and the other a ".22 revolver six or nine shot with lighter yellow handles, blue steel."

Later on October 11, according to Letterman's recorded statement, the defendant borrowed Letterman's car and told Letterman he was going to the home of his girl friend, Sheila, who lived on Golden Street in Springfield. While the defendant was gone, Letterman waited at the home of his sister. When the defendant picked up Letterman between 10 and 11 p.m., beer and tools were in the back of the car, items which had not been there before. The defendant told Letterman he had "broke in and got" the beer and tools.

According to Letterman's statement, the pair were en route to Sheila's home when officer LaRose tried to stop them. Letterman asked the defendant if he could get out, but the defendant told him that they could outrun the police or shoot them. During the chase, the defendant used the .22 automatic to fire some shots out of both front windows of the Cordoba[3]. He then handed the automatic to Letterman who threw it out the window. Despite a search by police, the .22 automatic was not recovered. Letterman thought the defendant had the .22 revolver in his possession when

---

**3.** In a subsequent statement to police, Letterman admitted to his own "shooting out the window [of the Cordoba] a couple of times ... while they were being chased by the police."

he got out of the vehicle after the collision with LaRose's patrol car.

On October 13, Patton interviewed a Tina Marie Wilson who identified an apartment on Chestnut Expressway where she said the defendant could be found. Wilson told Patton that the defendant had a handgun. Patton also learned the location of the defendant's girlfriend Sheila's residence on Golden Street. Patton obtained a warrant to search the home where he found a gun holster.

On October 13, 1987, the police arrested the defendant at the Chestnut Expressway address. When officers arrived, the defendant was in the living room. With the consent of the women who lived there, officers searched the apartment. They found a loaded .22 caliber magnum revolver in a bedroom under a dresser and a brown duffel bag in a bedroom [4]. When he was arrested, the defendant had two dozen .22 caliber "long rifle type" shells on his person. The cartridges had the letter "F" on the base of the shell casing.

In his opening statement at trial, defense counsel told the jury that the case was about four men—LaRose, the defendant, Letterman, and Donald Tummons [5]—and that Letterman initially had identified the person who shot at LaRose as "Donny."

On direct examination, LaRose identified the defendant as the driver of the Cordoba. LaRose described the weapon the defendant used to shoot at him as a "small caliber weapon" he believed to be "black." The prosecutor did not ask LaRose about his interrogation, if any, of Letterman at the scene. However, on cross-examination, the defendant's lawyer did question LaRose about Letterman's statements at the scene.

Q. (By the defendant's lawyer to LaRose) And isn't it true that upon getting

[Letterman] out of the vehicle he told you ... "don't kill me"?

A. Yes, sir.

Q. And he also told you, "Alls I know it was Donny"?

A. No, sir.

Q. He didn't tell you it was Donny?

A. Yes, sir. It wasn't when I got him out of the vehicle. After I got him out of the vehicle and took him into custody behind my patrol unit, that's when he made the statement, "Don't kill me.... I wasn't the dude shooting at you; it was Donny." He said the name "Donny."

When Letterman was called to testify, he refused, invoking his Fifth Amendment right to not testify against himself. On request of the state, the trial court declared Letterman unavailable to testify, and Patton read to the jury the portions of Letterman's transcribed statement referred to above.

Tina Wilson testified that mid-morning October 12 she picked up the defendant at Sheila's residence and took him to her home where he "got his things." The defendant had been staying at Wilson's residence "off and on" and his belongings had been at her house "for a couple of weeks." She identified a brown duffel bag, seized at the Chestnut Expressway apartment where the defendant had been arrested, as one of the "things" that the defendant had kept at her home. She denied seeing a handgun in the defendant's possession [6].

The owner of the Shamrock Liquor Store testified that the Laclede County Sheriff had notified her at 2:30 a.m., October 12, 1987, that her establishment had been broken into. She testified that liquor, beer, and cigarettes had been taken. The program director for a halfway house testified that after the defendant left that facility on September 19, 1987, without permission,

---

**4.** It is unclear from the trial transcript whether the revolver and duffel bag were found in the same or different bedrooms.

**5.** The defense attempted to show that Donald Tummons was the driver of the Cordoba rather than the defendant. Tummons, who was in the same area as the assault in the early morning of

October 12, 1987, fled from police officers in a 1970 Ford Torino when they tried to stop him for questioning about the shooting.

**6.** Wilson testified prior to Patton. Patton was permitted to testify that Wilson had told him she saw the defendant with a handgun.

the Department of Corrections issued a warrant for his arrest[7].

The holster taken from Sheila's home and the revolver seized from the Chestnut Expressway apartment were admitted into evidence over the defendant's objections.

## DISCUSSION AND DECISION

*Letterman's Statement*

■ In his first point on appeal, the defendant contends that the trial court erred in permitting Letterman's hearsay statement to be read to the jury. He argues that Letterman's statement could not have been used by the state for impeachment purposes because "Bobby Joe Letterman had not testified and no prior statements by Letterman had been introduced."

The defendant does not correctly recall the sequence of events at trial. In his opening statement, defense counsel told the jury that the case was about four men, including Donald Tummons, and that Letterman initially had identified the person who shot at LaRose as "Donny." Then, in his cross-examination of LaRose, who was the state's first witness, defense counsel asked about Letterman's statement that "Donny" fired at LaRose. It was later at trial that Letterman was declared unavailable because he refused to testify and his statement implicating the defendant was read to the jury.

> [P]rior inconsistent statements of a witness are admissible to impeach or discredit a witness to affect credibility. Impeachment is not improper in this state on the ground that the impeaching statements are hearsay or that they implicate the defendant in the commission of a crime, or are made out of the presence of the defendant.

*State v. Davis,* 566 S.W.2d 437, 450 (Mo. banc 1978) (citations omitted); *Henderson v. State,* 765 S.W.2d 336, 338 (Mo.App. 1989).

*Henderson* involved facts similar to those now before us. Movant Henderson had been convicted of vehicular manslaughter[8]. An investigating officer had obtained two statements from Henderson's wife Annie, who was a passenger in the vehicle when it was involved in the fatal collision. In her first statement, Exhibit F, Annie Henderson said she was the driver. The following day, she made a second statement, Exhibit G, in which she said her husband was driving. At trial, Annie Henderson invoked her Fifth Amendment rights and did not testify. Exhibit F was received into evidence at the request of movant Henderson's counsel. The state then offered Exhibit G which the court admitted over objection by the defense.

This court made the following observations about the admissibility of Exhibit G, Annie Henderson's statement that her husband was driving at the time of the collision:

> In refusing to testify at the jury trial by invoking the Fifth Amendment, Annie Henderson made herself "unavailable" as a witness. Both Exhibit F and Exhibit G are extrajudicial statements of Annie Henderson. After Exhibit F was received into evidence, Exhibit G was admissible, for impeachment purposes, as a prior inconsistent statement of Annie Henderson, and her unavailability at the trial rendered it unnecessary for the state to lay the foundation of first examining Annie Henderson with regard to the giving of Exhibit G and the circumstances under which it was given. The fact that Exhibit G was given by Annie Henderson after, rather than before, she gave Exhibit F is of no moment.

765 S.W.2d at 338.

In the case before us, once Letterman's statement that "Donny" had fired the shot was placed into evidence by the defendant, then Letterman's other prior statement, implicating the defendant, was admissible.

---

7. In Letterman's statement that Patton read to the jury, Letterman said the defendant had told him "there was a warrant for him from the halfway house."

8. This court affirmed the manslaughter conviction in *State v. Henderson,* 721 S.W.2d 100 (Mo. App.1986).

*Admission of Handgun and Holster*

■ In Point II the defendant claims the trial court erred in admitting into evidence the revolver and holster because they were "irrelevant and inflammatory in that they were not connected with [the defendant], being found away from him, and not identified as being connected with the crime."

Physical evidence is admissible " 'if it throws any relevant light upon a material matter at issue.' " *State v. Griffin,* 756 S.W.2d 475, 482 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989), *quoting State v. Murphy,* 592 S.W.2d 727, 730 (Mo. banc 1980). If relevant, such evidence should not be rejected because it tends to arouse prejudice in the jury, and its admission rests within the discretion of the trial court. *Murphy,* 592 S.W.2d at 731.

The defendant's argument is founded on relevance. He asserts that the revolver and holster were not relevant to any issue at trial because they were not connected to him or the crime. The defendant points out that the revolver and holster were not in his possession and were found at separate residences, far removed from and unconnected to, the scene of the assault. The defendant also points out there was no evidence that the revolver was tested in an attempt to show it was used in the assault. Nevertheless, we disagree with the defendant's assertions about a lack of relevance.

■ Weapons not directly connected with the defendant may be admitted into evidence when they bear on the crime with which he is charged. *State v. Young,* 701 S.W.2d 490, 496 (Mo.App.1985); *State v. Greathouse,* 519 S.W.2d 299, 302 (Mo.App.

1975). The identity of a weapon does not have to be "wholly unqualified" for it to be admitted into evidence. *State v. Collins,* 607 S.W.2d 712, 715 (Mo.App.1980). It is sufficient if the weapon offered into evidence "appeared to be of the same type," "was very similar," and was "approximately like" the one used in the offense. *State v. Crowley,* 571 S.W.2d 460, 463 (Mo.App. 1978). The weight to be given to the identification of a weapon is for the jury. *State v. Stancliff,* 467 S.W.2d 26, 30 (Mo.1971).

There was evidence from Letterman's statement that the defendant had in his possession a blue steel .22 caliber revolver immediately before he (the defendant) fired a shot at LaRose. LaRose said the handgun fired at him was a small caliber weapon that he believed to be black. A .22 caliber magnum cartridge was recovered from the Cordoba. Wilson told Patton that the defendant had a handgun in his possession when she took him to the Chestnut Expressway apartment. At that apartment, police recovered a .22 caliber magnum revolver. There was a sufficient connection between the revolver and the assault; the trial court did not abuse its discretion in admitting the gun into evidence[9].

■ We find no reversible error in the admission into evidence of the holster. The defendant fails to cite either facts or cases that would support his claim that the holster was inflammatory and, therefore, prejudicial to his defense. Assuming, without deciding, that the holster was irrelevant, we note that the admission of irrelevant evidence that would require reversal in a close case may be disregarded where evi-

---

9: The following cases, relied on by the defendant, are factually distinguishable: *State v. Perry,* 689 S.W.2d 123 (Mo.App.1985) (20–gauge shotgun, found following high speed chase, in defendant's mother's car in which defendant was a passenger, inadmissible where robbery weapon was a handgun and there was no evidence defendant owned the shotgun or knew of its presence in the vehicle); *State v. Reyes,* 740 S.W.2d 257 (Mo.App.1987) (Hunting knife under front seat of automobile in which defendant was back seat passenger inadmissible where victim was killed by shotgun blast and there was no evidence defendant had possessed the knife

and no evidence to otherwise connect the knife to defendant or the crime); *State v. Davis,* 530 S.W.2d 709 (Mo.App.1975) (Sawed-off shotgun not identified as robbery weapon [although "similar" to robbery weapon] found five days after crime in home of persons who had no connection with the robbery; defendant lived elsewhere and there was no evidence he knew of the shotgun's existence or that he had possessed it); *State v. Richards,* 334 Mo. 485, 67 S.W.2d 58 (1933) (Error to admit pistol seized from co-defendant's home; there was no evidence defendant had possessed or seen the firearm).

dence of guilt is strong. *State v. Burns,* 795 S.W.2d 527, 531 (Mo.App.1990). In such a case, the error is harmless. *State v. Girardier,* 801 S.W.2d 793, 796 (Mo.App. 1991). Even if the holster had been excluded, the other evidence was strong enough to permit the jury to find the defendant guilty beyond a reasonable doubt of assault in the first degree. *See Burns,* 795 S.W.2d at 531. Point II is denied.

## Evidence of Other Offenses

In Point III, the defendant claims that the trial court erred in admitting evidence of his escape from a halfway house and participation in a liquor store burglary shortly before the assault. The defendant argues that the evidence, offered to establish a motive to flee from LaRose and then shoot at him, does not fall within the motive exception to the general rule of inadmissibility of evidence of other crimes in this case because (a) motive is not an element of first degree assault, (b) no clear connection between the burglary and escape crimes and the assault was established, and (c) evidence of the burglary and escape tended to raise an inference of guilt of the assault.

We reject the defendant's argument. Although motive is not an element of the crime of assault in the first degree, where, as here, a defendant denies the act, the question of motive becomes important. *State v. Stapleton,* 518 S.W.2d 292, 296 (Mo. banc 1975). Motive is "the moving course, the impulse, the desire that induces criminal action on the part of the accused" and wide latitude is generally allowed in establishing motive. *State v. Willis,* 632 S.W.2d 63, 65 (Mo.App.1982).

In *State v. Mallett,* 732 S.W.2d 527 (Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987), the court affirmed the defendant's conviction of killing a highway patrolman. Evidence of the defendant's robbery of a Texas jewelry store the month before the murder was held to be admissible to show the defendant's motive for the killing.

Defendant's knowledge that he would quite probably be returned to Texas to face aggravated robbery charges for acts he committed while already in violation of his probation gave him a very discernible reason to kill Trooper Froemsdorf. Although the introduction of this evidence put before the jury evidence of a crime for which defendant had never been convicted, the probative value of the evidence was greater than any prejudicial effect.

*Id.* at 534–35.

Similarly, in *State v. Caldwell,* 695 S.W.2d 484 (Mo.App.1985), the eastern district held that evidence that a car was stolen and that the defendant had tampered with it was relevant to establish the defendant's intent to assault a police officer by running him down with a car.

Defendant almost ran down Officer Shoemake while defendant was being chased. Sensibly, the chase ensued because defendant knew the car to be stolen and because of defendant's tampering with another car. It also makes sense that defendant wanted to continue to avoid his pursuers, even if it meant running down a police officer, because of these crimes.

*Id.* at 486.

The defendant in the case before us was aware of the warrant for his arrest following his escape. It is a reasonable inference that he also was aware that in the Cordoba was evidence implicating him in the Shamrock Liquor Store burglary and theft. It makes sense that, because of these crimes, the defendant wanted to avoid LaRose, even if it meant assaulting the officer by shooting at him. The probative value of evidence of the escape and burglary was greater than its prejudicial effect. The trial court did not abuse its discretion in admitting the evidence. Point III is rejected.

We affirm the judgment in case No. 16258.

## CASE NO. 17529

On October 24, 1989, the defendant filed a pro se Rule 29.15 motion. Subsequently, appointed counsel sought additional time in which to amend the pro se mo-

tion; however, no amended motion was filed. The defendant's pro se motion was dismissed without an evidentiary hearing. The trial court's findings of fact and conclusions of law did not include a determination of why the defendant's counsel failed to amend the pro se motion.

The defendant argues, and the state concedes, that this court should remand case number 17529 for a hearing to determine whether counsel's decision not to file an amended Rule 29.15 motion resulted from counsel's determination that the filing of an amended motion was not warranted or resulted from the defendant's negligence or intentional failure to act. *See Luleff v. State*, 807 S.W.2d 495 (Mo. banc 1991). In *Luleff*, the court stated:

> A record that does not indicate whether appointed counsel made the determinations required by *Rule 29.15(e)* creates a presumption that counsel failed to comply with the rule. Where counsel determines that filing an amended motion is not warranted, counsel should make that determination a part of the record. At such time as the motion court may proceed to rule a postconviction motion and there is no record of any activity by counsel on movant's behalf, the motion court shall make inquiry, *sua sponte*, regarding the performances of both movant and counsel. If counsel's apparent inattention results from movant's negligence or intentional failure to act, movant is entitled to no relief other than that which may be afforded upon the *pro se* motion. If the court determines, on the other hand, that counsel has failed to act on behalf of the movant, the court shall appoint new counsel, allowing time to amend the *pro se* motion, if necessary, as permitted under *Rule 29.15(f)*.

807 S.W.2d at 498 (footnote omitted).

The judgment in case number 17529 is reversed and the cause remanded for the trial court to determine whether appointed counsel performed as required by Rule 29.-15. If the court finds that counsel did not perform as required and that counsel's apparent inattention was not the result of the defendant's negligence or intentional fail-

ure to act, the court shall appoint new counsel, allowing time, if necessary, to amend the motion as permitted under the rule and the cause shall proceed according to the rule.

MAUS and MONTGOMERY, JJ., concur.